**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 14-4546**

———————

UNITED STATES OF AMERICA,

            Plaintiff - Appellee,

        v.

EDGAR PARRAL-DOMINGUEZ, a/k/a Hector Sandoval-Lopez, a/k/a
Edgar Dominguez-Arellanez,

            Defendant - Appellant.

———————

Appeal from the United States District Court for the Eastern
District of North Carolina, at New Bern.  Louise W. Flanagan,
District Judge.  (4:13-cr-00080-FL-1)

———————

Argued:  May 13, 2015                    Decided:  July 23, 2015

———————

Before TRAXLER, Chief Judge, and WILKINSON and FLOYD, Circuit
Judges.

———————

Vacated and remanded by published opinion.  Judge Floyd wrote the
opinion, in which Chief Judge Traxler joined.  Judge Wilkinson
wrote a dissenting opinion.

———————

**ARGUED:** Eric Joseph Brignac, OFFICE OF THE FEDERAL PUBLIC DEFENDER,
Raleigh, North Carolina, for Appellant.  Kristine L. Fritz, OFFICE
OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for
Appellee.  **ON BRIEF:** Thomas P. McNamara, Federal Public Defender,
OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina,
for Appellant.  Thomas G. Walker, United States Attorney, Jennifer
P. May-Parker, Assistant United States Attorney, OFFICE OF THE
UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

———————

FLOYD, Circuit Judge:

Each year, thousands of immigrants are deported for illegally entering the country. But before leaving, many face a prolonged pit stop in federal prison. The 16-level sentencing enhancement under U.S.S.G. § 2L1.2 may extend their stay even longer for those previously deported for committing a "crime of violence."

This case concerns whether a Mexican citizen, Edgar Parral-Dominguez, was properly subject to that enhancement and sentenced to over five years' imprisonment. After Dominguez pleaded guilty to illegally reentering the country, the district court applied the enhancement because, in its view, Dominguez's previous conviction in North Carolina for discharging a firearm into an occupied building is a requisite "crime of violence." Specifically, the district court ruled that Dominguez's offense necessarily involved the use, attempted use, or threatened use of force against a person. In fact, under North Carolina law, there need be only the use of force against property to sustain a conviction. Because the court's decision was in error and should not be construed as harmless, we vacate Dominguez's sentence and remand for further proceedings.

I.

In 2000, Appellant-Defendant Edgar Parral-Dominguez[1] (Dominguez) left Mexico with his father and entered the United States. At the time, Dominguez was 14 years old. Although his father eventually returned to Mexico, Dominguez remained.

On New Year's Day 2006, a firearm was discharged toward a woman's residence in Winston-Salem, North Carolina. Over a year later, North Carolina law enforcement arrested and charged Dominguez for the incident.[2] Specifically, Dominguez was charged with and eventually convicted for an aggravated felony, discharging a firearm into a building under N.C.G.S.A. § 14-34.1 ("the State Offense").

During his post-arrest processing, state authorities found that Dominguez was unlawfully present in the country. Thus, after he pleaded guilty to the State Offense, agents from U.S. Immigration and Customs Enforcement (ICE) detained him and in August 2007 deported him to Mexico. Within months, however, Dominguez returned to North Carolina, eventually settling in Wilmington.

---

[1] Dominguez's actual name is Edgar "Dominguez-Parral," not "Parral-Dominguez." J.A. 23. Nevertheless, the underlying indictment identifies him as Parral-Dominguez. For consistency's sake, we do the same.

[2] Although Dominguez maintained at this case's underlying sentencing that another man he was with actually fired the gun, this nuance, even if true, is immaterial to this appeal.

Three years after his deportation, local county law enforcement arrested Dominguez with more than an ounce of cocaine. He was ultimately convicted in state court for the single offense of trafficking cocaine, but as part of his post-arrest processing, state authorities discovered that Dominguez had been deported and was unlawfully present in the country. ICE officials met with Dominguez in December 2010 and August 2011, confirming his status as an illegal alien.

In December 2013, a federal grand jury sitting in the Eastern District of North Carolina indicted Dominguez under 8 U.S.C. §§ 1326(a) and (b)(2) for illegally reentering the United States after being convicted of an aggravated felony. ICE officials took custody of Dominguez the same month, and he pleaded guilty to the charged offense on March 11, 2014, without the benefit of a plea agreement.

Before Dominguez's sentencing, U.S. Probation prepared a presentence investigation report (PSR). The parties do not dispute that the PSR correctly stated all the facts contained therein; that Dominguez has a Category IV criminal history; that his base offense level is eight; and that he earned a three-point reduction for acceptance of responsibility. Dominguez lodged a single objection to the PSR, which is now at the center of this appeal.

The PSR proposed a 16-level enhancement to Dominguez's offense level for his having been previously convicted of a "crime

4

of violence" under U.S.S.G. § 2L1.2(b)(1)(A)(ii). Applying this enhancement, the PSR calculated that Dominguez's total offense level was 21--resulting in a Guidelines range of 57 to 71 months' imprisonment.

Dominguez argued that, as a matter of law, the State Offense did not constitute the requisite crime of violence under § 2L1.2(b)(1)(A)(ii). He did, however, concede that he merited an 8-level enhancement under § 2L1.2(b)(1)(C) because his previous conviction was an aggravated felony. Thus, according to Dominguez, his total offense level should be 13. Under Dominguez's proposed treatment, his Guidelines range would be 24 to 30 months' imprisonment.

After the Government and Probation filed written responses to Dominguez's objection, the district court heard argument at Dominguez's sentencing hearing on July 8, 2014. The court overruled Dominguez's objection because the occupant of a building "will surely feel threatened by the physical force that [has] intruded" from a defendant who shoots at the building. J.A. 75 (quoting United States v. Cortez-Arias, 403 F.3d 1111, 1116 (9th Cir. 2005), abrogated by Fernandez–Ruiz v. Gonzales, 466 F.3d 1121, 1132 (9th Cir. 2006) (en banc)). Thus, the court imposed the 16-level enhancement, producing an advisory Guidelines range of 57 to 71 months' imprisonment.

The district court then heard argument on how to fashion a proper sentence. Although Dominguez's counsel believed that a sentence in the Guidelines range would be greater than necessary, J.A. 76, the Government "submit[ted] that a guideline sentence would be appropriate" and twice asked the court to "consider somewhere around the mid range to the high end of the guideline range." J.A. 81. In turn, the court sentenced Dominguez in the middle of the Guidelines range: 65 months' imprisonment. In announcing the sentence, the court posited that 65 months' imprisonment is the "only" sentence "that sends the message that the defendant will be punished for his actions and his conduct, that he must respect the law, that his dangerousness must be mitigated, and he cannot come back into this country." J.A. 84.

The day after sentencing, the district court memorialized its decision in a nine-page memorandum opinion. After noting the lack of binding precedent, the court relied heavily on the holding of an unpublished Fourth Circuit decision to conclude that the State Offense is a crime of violence. United States v. Wilkerson, 492 F. App'x 447, 449 (4th Cir. 2012) (per curiam). The court reiterated its line of reasoning from the sentencing hearing that the act of shooting would inherently threaten any building inhabitants.

Dominguez timely appealed, claiming his sentence is three years longer than what a properly calculated Guidelines range would suggest is appropriate.

## II.

This appeal centers on one major issue: Does the state offense of discharging a firearm into an occupied building under N.C.G.S.A. § 14-34.1(a) constitute a crime of violence for federal sentencing purposes under U.S.S.G. § 2L1.2?  We review this issue de novo. United States v. Henriquez, 757 F.3d 144, 147 (4th Cir. 2014). Even if we hold that the North Carolina offense is not a crime of violence, and thus that the district court committed procedural error, we may still affirm Dominguez's 65-month term of imprisonment if we find that the error did not affect his sentence. United States v. Gomez–Jimenez, 750 F.3d 370, 382 (4th Cir. 2014). As discussed below, we find that the State Offense is not a crime of violence, and that the district court's conclusion to the contrary was not harmless.

### A.

#### 1.

First, we assess whether the State Offense is a crime of violence under § 2L1.2.  To answer this question, we apply the so-called "categorical approach" set forth in Taylor v. United States, 495 U.S. 575 (1990), and recently clarified in Descamps v. United

7

*States*, 133 S. Ct. 2276 (2013).[3] "Under that approach, we consider only the elements of the statute of conviction rather than the defendant's conduct underlying the offense." *Omargharib v. Holder*, 775 F.3d 192, 196 (4th Cir. 2014). If the State Offense has the same elements as for a "crime of violence" as defined in § 2L1.2, then Dominguez's prior conviction is a predicate offense under that section. Id. But if the State Offense "sweeps more broadly" by criminalizing more conduct than is captured under § 2L1.2(b)(1)(A)(ii), then the State Offense is not a qualifying offense. Id. (quoting *Descamps*, 133 S. Ct. at 2283). In essence, we must compare the contours of a "crime of violence" under § 2L1.2 with the breadth of conduct proscribed by N.C.G.S.A. § 14-34.1(a).

We begin with § 2L1.2, which states that a 16-level enhancement applies if "the defendant previously was deported . . . after . . . a conviction for a felony that is . . . a crime of violence." U.S.S.G. § 2L1.2(b)(1)(A)(ii). The text of § 2L1.2 does not expressly define the phrase "crime of violence." But the application note clarifies that the phrase contemplates any offense "under federal, state, or local law that has as an element the use, attempted use, or threatened use of physical force against the person of another." Id. § 2L1.2(b)(1) cmt. n.1(B)(iii). This

---

[3] In arguing their respective positions below and on appeal, the parties have relied on the categorical approach. See J.A. 96 n.2 (district court noting that "neither party suggested that use of the modified categorical approach is appropriate").

so-called "use-of-force clause" serves as the sole basis with which the Government argues that the State Offense is a crime of violence under § 2L1.2. United States v. Perez-Perez, 737 F.3d 950, 952 n.4 (4th Cir. 2013).

Significant to this appeal, we must recognize the limited applicability of the use-of-force clause in § 2L1.2. First, and most importantly, by its plain language the use-of-force clause does not encompass acts involving the use of force against property (rather than persons). United States v. Jaimes–Jaimes, 406 F.3d 845, 849 (7th Cir. 2005). And second, unlike other sections of the Guidelines,[4] the use-of-force clause does not include "acts that merely pose a risk of harm to another person." Id.; see also United States v. Calderon–Pena, 383 F.3d 254, 261 (5th Cir. 2004) (en banc) (per curiam) ("Creating a risk of injury, even when done knowingly or intentionally, is clearly not the same as using or attempting to use physical force against the person of another.").

---

[4] For example, in determining whether a defendant is a "career offender" under U.S.S.G. § 4B1.1(a) or an "armed career criminal" under § 4B1.4(c)(2), the phrase "crime of violence" captures not only a federal or state felony that "has as an element the use, attempted use, or threatened use of physical force against the person of another," but also a crime that "presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a)(2) (incorporated by § 4B1.1 cmt. n.1 and § 4B1.4(c)(2)). We also note that the Supreme Court's decision in Johnson v. United States, No. 13-7120, 2015 WL 2473450 (June 26, 2015), concerned the similar risk-of-injury language in 18 U.S.C. § 924(e)(2)(B) and does not affect our decision in this case.

9

With an understanding of what a crime of violence under § 2L1.2 is--and what it is not--we turn to the State Offense and its elements. The State Offense makes it a felony for a person to "willfully or wantonly discharge[] or attempt[] to discharge any firearm . . . into any building, structure, vehicle, [or other specified physical structure] while it is occupied." N.C.G.S.A. § 14-34.1(a). Although not listed as an element in the statute, the Supreme Court of North Carolina has read a knowledge element into the offense: "the defendant must have had 'reasonable grounds to believe that the building might be occupied by one or more persons.'" State v. Everette, 361 N.C. 646, 650 (2007) (quoting State v. James, 342 N.C. 589, 596 (1996)). Thus, the State Offense has been reformulated to prohibit a person from "intentionally, without legal justification or excuse, discharg[ing] a firearm into [a]n occupied building [A] with knowledge that the building is then occupied by one or more persons or [B] when he has reasonable grounds to believe that the building might be occupied by one or more persons." State v. Williams, 284 N.C. 67, 73 (1973), abrogated on other grounds by State v. Weaver, 306 N.C. 629, 635 (1982). We are bound by this interpretation in assessing whether the State Offense falls within the ambit of § 2L1.2's use-of-force clause. See United States v. Aparicio-Soria, 740 F.3d 152, 154 (4th Cir. 2014) (en banc) ("To the extent that the statutory definition of the prior offense has been interpreted by

10

the state's highest court, that interpretation constrains our analysis of the elements of state law.").

Under any reading of N.C.G.S.A. § 14-34.1(a) and the caselaw interpreting the statute, it is clear that the State Offense does not require that an offender use, attempt to use, or threaten to use force against another person. The crime is complete when a person (1) intentionally (2) discharges a firearm (3) toward an occupied building (4) when the shooter knows or has reasonable grounds to believe that the building might be occupied. Williams, 284 N.C. at 73. Even if peripherally relevant, proving that an occupant is targeted or threatened is unnecessary to satisfying the State Offense's elements. See State v. Canady, 191 N.C. App. 680, 689 (2008) (holding that a person is guilty of the State Offense for merely damaging a building's exterior, with no bullet penetration so as to actually threaten any occupant); State v. Messick, 88 N.C. App. 428, 437 (1988) ("An assault on a person is not an essential element of discharging a firearm into an occupied vehicle."); cf. Calderon-Pena, 383 F.3d at 260 (reasoning that a child-endangerment offense is not a crime of violence, because the offense does not require any bodily contact or awareness of danger). Therefore, the State Offense cannot be construed as a crime of violence under § 2L1.2's use-of-force clause. Indeed,

11

this holding coincides with how our sister circuits treat similar discharge-of-firearm offenses under § 2L1.2.[5]

The Government's cited authority to the contrary has either been abrogated,[6] involves the broader risk-of-physical-injury clause in § 4B1.2(a)(2),[7] or is distinguishable on the facts.[8] Moreover, the Government wrongly emphasizes considerations extraneous to our analysis under the categorical approach. For example, North Carolina courts have noted that the state legislature's primary objective in enacting the State Offense was to "protect[] . . . the occupant(s) of the building." Canady, 191

---

[5] See United States v. Narvaez–Gomez, 489 F.3d 970, 976-77 (9th Cir. 2007) (ruling that discharging a firearm at an occupied dwelling under California law is categorically not a crime of violence under § 2L1.2, because it may be committed with "purely reckless conduct" toward another person); Jaimes–Jaimes, 406 F.3d at 850-51 (holding that discharging a firearm into a vehicle or building under Wisconsin law is not a crime of violence under § 2L1.2, because the offense contains no element consistent with the use-of-force clause and does not even require that an occupant actually be present); United States v. Alfaro, 408 F.3d 204, 209 (5th Cir. 2005) (finding that shooting into an occupied dwelling under Virginia law is not a crime of violence under § 2L1.2, because a defendant could commit the crime "merely by shooting a gun at a building that happens to be occupied without actually shooting, attempting to shoot, or threatening to shoot another person").

[6] United States v. Cortez-Arias, 403 F.3d 1111, 1115-16 (9th Cir. 2005), abrogated by Fernandez–Ruiz v. Gonzales, 466 F.3d 1121 (9th Cir. 2006) (en banc).

[7] United States v. Rice, 520 F.3d 811, 821 (7th Cir. 2008).

[8] See, e.g., United States v. Rivera–Valenzuela, 492 F. App'x 685, 687 (7th Cir. 2012) (citing United States v. Curtis, 645 F.3d 937, 941-42 (7th Cir. 2011)) (analyzing the Illinois offense of discharging a firearm in the direction of a vehicle or person, which involves a smaller target and a different knowledge requirement than for the State Offense).

12

N.C. App. at 687 (quoting Williams, 284 N.C. at 72). And in codifying the State Offense, the state legislature placed N.C.G.S.A. § 14-34.1(a) in a subchapter titled, "Offenses Against the Person." Indeed, as the Government opened at oral argument, "common sense tells us that this North Carolina statute exists to protect people; this is not about property." Yet nowhere does the Government cite authority that would permit us to set aside the Supreme Court's directive to "look only to" the elements of a prior offense, Descamps, 133 S. Ct. at 2283 (quoting Taylor, 495 U.S. at 600), and instead defer to legislative intent, an offense's placement in a statutory code, and "common sense." Indeed, these considerations would serve only as distractions from the discrete, narrow assessment of a crime's underlying elements, as mandated by the Supreme Court in Taylor and Descamps.

For these reasons, the district court committed procedural error by concluding that Dominguez's offense under N.C.G.S.A. § 14-34.1(a) is a crime of violence under § 2L1.2.

2.

Rather than apply the correct analysis as mandated by the Supreme Court in Descamps, the dissent resists, harkening back to a time in which its approach had not been overwhelmingly rejected in this Circuit. See generally United States v. Aparicio-Soria, 740 F.3d 152 (4th Cir. 2014) (en banc). Certainly what the dissent

13

lacks in fidelity to precedent, it makes up in color. Despite the dissent's want to the contrary, the North Carolina legislature's so-called "central concern" in criminalizing the conduct at issue is a red herring.

The dissent ignores relevant precedent, misreads this opinion, and exaggerates the opinion's "practical implications" in several respects, too numerous to merit individual responses. Most notably, though, nowhere do we say, expressly or implicitly, that "shooting into an occupied building does not involve any deployment of force whatsoever against the person or people inside." Indeed, in many cases, it does. But that does not excuse us from the categorical approach's key focus on elements, Descamps, 133 S. Ct. at 2283, and simply comparing the contours of a crime of violence under § 2L1.2 with the breadth of conduct proscribed by N.C.G.S.A. § 14-34.1(a).

The dissent also claims that the State Offense's knowledge requirement supports the dissent's proposed result, as it posits that "the perpetrator must know or have reasonable grounds to believe he is firing in the direction of another person." This is false. In actuality, the shooter may be guilty by merely having reasonable grounds to believe that the targeted building might be occupied, Williams, 284 N.C. at 73, and without any specific intent to do, attempt, or threaten harm to any occupants therein. In other words, a person may be guilty of the State Offense without

14

intentionally or knowingly shooting into an occupied building, so long as he or she recklessly ran the risk that the building was occupied. Additionally, in many cases, a shooter, an occupant, and a bullet's trajectory might indeed fall on one line. But in a given case, a bullet might miss an occupant widely--perhaps intentionally--yet the shooter has still committed a crime. No binding North Carolina authority requires the government to prove that a defendant shot toward an occupant, and in concluding to the contrary, the dissent implicitly fantasizes that a home has become not only one's castle, Silverman v. United States, 365 U.S. 505, 511 n.4 (1961), but legally merged with anyone therein.

Finally, the dissent claims that this decision "stands in conflict with" a line of decisions in the Seventh Circuit. Again, this is false. Assuming for the sake of argument that the Seventh Circuit's precedent was correctly decided, that line of authority explicitly distinguishes crimes that involve the same knowledge requirement that exists for the North Carolina offense at issue: if an offense requires a defendant to realize only "that there might be a person present," versus requiring that a defendant "know or should reasonably know that another person" occupied a structure, then the use-of-force clause does not apply. United States v. Curtis, 645 F.3d 937, 941-42 (7th Cir. 2011)) (emphases in original) (quoting United States v. Rice, 520 F.3d 811, 821 (7th Cir. 2008)); see also Jaimes-Jaimes, 406 F.3d at 849-50.

15

Conveniently, the dissent ignores this distinction.  Thus, this opinion is consistent with Seventh Circuit precedent.


                              B.

     Having found a Guidelines error, we assess it for harmlessness.  Gomez-Jimenez, 750 F.3d at 382.  A Guidelines error is harmless if we believe "(1) 'the district court would have reached the same result even if it had decided the guidelines issue the other way,' and (2) 'the sentence would be [substantively] reasonable even if the guidelines issue had been decided in the defendant's favor.'"  Id.  (quoting United States v. Savillon-Matute, 636 F.3d 119, 123 (4th Cir. 2011)).  At dispute here is only whether the district court would have reached the same 65-month sentence had it correctly found that the State Offense is not a crime of violence under § 2L1.2.

     In many cases, a judge is unequivocal about what effect any Guidelines miscalculation would have on the ultimate sentence.  A judge may say, for example, that in imposing a sentence:

>          I do believe that I have properly calculated
>          the advisory guideline range.  If, however,
>          for some reason someone [on appeal] were to
>          determine that I did not, I announce an
>          alternative variant sentence . . . .

Id. at 383 (quoting the judge at a sentencing hearing).  These words make it "abundantly clear" that a judge would have imposed

the same sentence, regardless of any procedural error.  Id. at 382-83.  But such words do not exist here.

The Government and dissent emphasize that the court noted during sentencing that 65 months' imprisonment is the "only" sentence that would sufficiently deter Dominguez from committing more crimes and reentering the country.  But we decline to afford this potentially stray phrasing so much weight as to deprive a man of an errorless sentencing.  To give full credit to the judge's statement would require us to downplay the effort exhausted by the parties and the court in calculating a Guidelines range and to denigrate the tangible effect that the Guidelines range likely had in this case.[9]

---

[9] See, e.g., United States v. Lewis, 606 F.3d 193, 200 (4th Cir. 2010) (noting that the Guidelines range should be "the starting point and the initial benchmark" (quoting Gall v. United States, 552 U.S. 38, 49 (2007))); United States v. Turner, 548 F.3d 1094, 1099 (D.C. Cir. 2008) ("Practically speaking, applicable Sentencing Guidelines provide a starting point or 'anchor' for judges and are likely to influence the sentences judges impose."); Hon. Mark W. Bennett, Confronting Cognitive "Anchoring Effect" and "Blind Spot" Biases in Federal Sentencing: A Modest Solution for Reforming a Fundamental Flaw, 104 J. Crim. L. & Criminology 489, 492 (2014) ("[I]t is critically important for sentencing judges, probation officers who prepare presentence reports, and practicing lawyers to understand the potential robust and powerful anchoring effect of advisory Guidelines and the effect of the 'bias blind spot' in determining just sentences."); Hon. Jed S. Rakoff, Why the Federal Sentencing Guidelines Should be Scrapped, 26 Fed. Sent'g Rep. 6, 2013 WL 8171733, at *8 (Oct. 1, 2013) ("[T]he very first thing a judge is still required to do at sentencing is to calculate the Guidelines range, and that creates a kind of psychological presumption from which most judges are hesitant to deviate too far.").

It is not clear that Dominguez's sentencing was unaffected by the court's error. The court took a substantial amount of time--before, during, and after sentencing--to consider and to rule on Dominguez's objection to the § 2L1.2 sentencing enhancement. And then after winning below on the issue, the Government twice asked the court to impose a sentence "somewhere around the mid range to the high end of the guideline range" as "appropriate." J.A. 81. Perhaps unsurprisingly, the district court did just that, meting out a sentence square in the middle of the wrongly calculated Guidelines range.

Yet, the Government and the dissent would have us believe that these facts had no effect on Dominguez's sentencing; that regardless of the calculated Guidelines range, 65 months' imprisonment is the "only" sentence he would have received. Without more certainty that the longer sentence--potentially taking more than three years of a man's life--was wholly unaffected by the court's error, this is a belief that we cannot embrace. Thus, we find that the district court's error was not harmless, and Dominguez's sentence is hereby vacated.

### III.

For the aforementioned reasons, we vacate Dominguez's sentence and remand the case for further proceedings.

VACATED AND REMANDED

18

WILKINSON, Circuit Judge, dissenting:

The majority contends that a central concern of the North Carolina statute at issue here is the protection of property. Wrong! The statute explicitly requires that the attacked property be occupied. Who does the majority think occupies the property? Pigs and chickens? No, the statute self-evidently has in mind actual people, a.k.a. human beings. The discharge of a firearm into such a property, which the shooter knows or believes to be occupied, plainly involves "the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 2L1.2 cmt. n.1(B)(iii). That is all the United States Sentencing Guidelines require.

As the district court here recognized, this should be a straightforward case. North Carolina criminalizes the discharge of a weapon into occupied property when the shooter knows or believes someone is inside. N.C. Gen. Stat. § 14-34.1(a). This law protects innocent bystanders, targets of gun violence, and other would-be victims. It helps keep people secure inside their homes, businesses, vehicles, and other structures. Nevertheless, the majority fails to recognize this brazen and dangerous act as a "crime of violence" under the relevant provision of the Guidelines. § 2L1.2(b)(1)(A)(ii) & cmt. n.1(B)(iii). In the majority's view, shooting into an occupied building does not involve any deployment

19

of force whatsoever against the person or people inside.[*] I cannot endorse so strained a reading of the North Carolina law and federal Guidelines. Firing a bullet into a building that happens, by sheer luck, to miss an occupant is an unmistakably violent act.

## I.

Congress did, after all, seek to punish more sternly the most violent behaviors. In many instances, the impetus is recidivist conduct by career offenders. See U.S.S.G. § 4B1.2. In this case, it is unlawfully reentering the United States after deportation for committing a crime of violence. See id. § 2L1.2. The meaning of "crime of violence" under this Guidelines provision is carefully cabined, see id. § 2L1.2 cmt. n.1(B)(iii), as most enhancements of this nature are. For, notwithstanding their slight variations in wording, sentencing enhancements for crimes of violence have much in common. The statutory and Guidelines provisions utilizing these enhancements all require at least one predicate conviction. The enhancements do not apply to arrest records. They do not apply to misdemeanors. They do not even apply to all felonies. They do reach, as here, convictions for serious felonies involving active assertions of "violent force -- that is, force capable of causing

---

[*] The majority protests that "nowhere do we say, expressly or implicitly, that 'shooting into an occupied building does not involve any deployment of force whatsoever against the person or people inside.'" Maj. Op. 14. But of course the majority says exactly that, for if it believed force was unleashed against the occupant, § 2L1.2 would apply, and the sentence would be affirmed.

physical pain or injury to another person." Johnson v. United States, 559 U.S. 133, 140 (2010).

To fail to heed the purpose of these enhancements is to degrade the basic implements of societal self-defense. Congress, the Sentencing Commission, and the public at large have a more than valid interest in ensuring that individuals who have repeatedly committed crimes of violence, or who have returned illegally to this country after expulsion for committing a crime of violence, are adequately punished. See Taylor v. United States, 495 U.S. 575, 581-90 (1990) (detailing Congress's focus in violent-crime sentencing enhancements on "those who commit a large number of fairly serious crimes as their means of livelihood, and who, because they possess weapons, present at least a potential threat of harm to persons"); H.R. Rep. No. 98-1073, at 1 (1984) (observing that "a large percentage of [violent] crimes are committed by a very small percentage of repeat offenders"); see also Leocal v. Ashcroft, 543 U.S. 1, 11 (2004).

Somehow the majority fails to grasp the highly destructive behavior that this crime represents, or to appreciate society's desire to do something about it. The Supreme Court has said that our inquiry should be a "realistic" one, Gonzales v. Duenas-Alvarez, 549 U.S. 183, 193 (2007), meaning that we must depart our tranquil universe in order to best ascertain congressional intent.

I thus do not shy in the slightest from pointing out the practical implications of the majority's holding. The seriousness of this crime -- and the immediate danger it creates for people nearby -- should be beyond question. For instance, although nationwide statistics are scarce, one study documented 317 actual victims who were killed or injured by stray bullets during a yearlong period in 2008-2009. Garen J. Wintemute et al., Epidemiology and Clinical Aspects of Stray Bullet Shootings in the United States, 73 J. Trauma & Acute Care Surgery 215, 218 (2012). Overwhelmingly, the victims had no inkling of the events leading to the gunfire, and more than two-thirds of the victims were indoors when they were struck. Id. at 219. Reports about these tragedies are as commonplace as they are distressing. See Suzanne Daley & Michael Freitag, Wrong Place at the Wrong Time: Stray Bullets Kill More Bystanders, N.Y. Times, Jan. 14, 1990; When a Bullet Misses Its Target, It Can Still Kill, NPR: All Things Considered, June 1, 2014. Stray-bullet shootings, most of them into buildings, spawn a pervasive anxiety that afflicts entire communities. See Philip J. Cook & Jens Ludwig, The Costs of Gun Violence Against Children, 12 Future Child. 87, 89, 91 (2002). For these bullets do not politely stop for bystander adults or defenseless children.

Firing into dwelling places also has an odious historical pedigree, as Klansmen regularly shot into homes to frighten and

22

forewarn African Americans therein. See Paul D. Escott, Many Excellent People: Power and Privilege in North Carolina 1850-1900, at 152-53 (1985). No one believes this noxious tactic of intimidation and control has somehow magically ceased today. In many neighborhoods tormented by gang violence, moreover, gang members shoot into occupied buildings to cow rival gangs or assert authority over turf. See Leonard S. Rubinowitz & James E. Rosenbaum, Crossing the Class and Color Lines: From Public Housing to White Suburbia 86-87 (2000). Many gang-related homicides involve firearms and public places. See Ctrs. for Disease Control & Prevention, Gang Homicides -- Five U.S. Cities, 2003-2008, 61 Morbidity & Mortality Wkly. Rep. 46, 46 (2012). The ensuing danger to bystanders, even those in the seeming safety of a building or vehicle, is self-evident.

We may not live in neighborhoods where the sound of gunfire is a nightly occurrence, but we should still understand the plight of those who hide under beds or in bathtubs to avoid being hit. See Cook & Ludwig, supra, at 91 ("One single mother living in Chicago's public housing reported, 'At night you had to put your mattress on the floor because bullets would be coming through the windows. It was like Vietnam.' In other urban neighborhoods, children are taught by their parents to hide under beds or in bathtubs at the sound of gunfire." (footnote omitted)). Children whose homes are no sanctuary are left to grow up in fear.

23

Our fellow citizens who do live in disadvantaged neighborhoods understand the mortal dangers and intimidating powers of stray bullets -- or bullets purposefully aimed at them. If a bullet strikes their home while they are inside, occupants would certainly be forgiven for thinking that someone tried to use deadly force against them. See U.S.S.G. § 2L1.2 cmt. n.1(B)(iii). If we were inside, we would alert soon enough to the violent nature of this act.

II.

A.

The prior felony conviction at issue here is an exceptionally well-qualified candidate for an advanced "crime of violence" degree. Let's take the federal aspect of the issue first. The Guidelines provisions for immigration offenses call for a sentencing enhancement "[i]f the defendant previously was deported, or unlawfully remained in the United States, after . . . a conviction for a felony that is . . . a crime of violence." U.S.S.G. § 2L1.2(b)(1)(A)(ii). In the Guidelines commentary, the Sentencing Commission listed a dozen offenses that meet the criteria for a "crime of violence." Id. § 2L1.2 cmt. n.1(B)(iii). Recognizing the diverse nature of criminal activity and criminal codes across the United States, the Commission also delineated a broad category of offenses that equally qualify as crimes of violence: "any other offense under federal, state, or

24

local law that has as an element the use, attempted use, or threatened use of physical force against the person of another." Id. Parral-Dominguez's predicate crime falls squarely in that category.

The North Carolina statute under which Parral-Dominguez was previously convicted makes it a felony to "willfully or wantonly discharge[] or attempt[] to discharge any firearm or barreled weapon . . . into any building, structure, vehicle, aircraft, watercraft, or other conveyance, device, equipment, erection, or enclosure while it is occupied." N.C. Gen. Stat. § 14-34.1(a) (emphasis added). Our charge is to discern the likely practical applications of this statute, not to concoct hypothetical scenarios. See United States v. Diaz-Ibarra, 522 F.3d 343, 348 (4th Cir. 2008) (requiring "'a realistic probability, not a theoretical possibility,' that the state would apply its statute to conduct that falls outside the definition of 'crime of violence'" (quoting Gonzales v. Duenas-Alvarez, 549 U.S. 183, 193 (2007))). The majority is strikingly reticent about actual nonviolent applications of this statute. And no wonder. On its face, this law concerns the senseless firing of a weapon toward human beings located inside a structure such as a building or a vehicle.

B.

The majority fares even worse under "the categorical approach's key focus on elements," Maj. Op. at 14-15, here those of N.C. Gen. Stat. § 14-34.1(a). North Carolina precedents reinforce what a facial examination of the statute makes clear. A person violates this statute "'if he intentionally, without legal justification or excuse, discharges a firearm into an occupied building with knowledge that the building is then occupied by one or more persons or when he has reasonable grounds to believe that the building might be occupied by one or more persons.'" State v. James, 466 S.E.2d 710, 715 (N.C. 1996) (quoting State v. Williams, 199 S.E.2d 409, 412 (1973)). This knowledge requirement is significant: the perpetrator must know or have reasonable grounds to believe he is firing in the direction of another person.

The majority asserts that "there need be only the use of force against property to sustain a conviction" under this statute. Maj. Op. at 2. But this law guards people, not property. The "purpose" that impelled the North Carolina General Assembly was "to protect occupants of the building, vehicle or other property described in the statute." State v. Mancuso, 364 S.E.2d 359, 362 (N.C. 1988); see also State v. Blizzard, 184 S.E.2d 851, 855, 856 (N.C. 1971); State v. Jones, 409 S.E.2d 322, 326-27 (N.C. Ct. App. 1991). Indeed, the statute itself covers not only any conventional "firearm" but also any "barreled weapon capable of discharging

26

shot, bullets, pellets, or other missiles at a muzzle velocity of at least 600 feet per second." N.C. Gen. Stat. § 14-34.1(a). The common feature of all those weapons is obvious: they share a "propensity to penetrate a structure and injure occupants." State v. Small, 689 S.E.2d 444, 451 (N.C. Ct. App. 2009). Contrary to the majority's suggestion, see Maj. Op. at 13, the statute's fundamental concern for people rather than property is evident at first glance. The majority would have us believe it was a broken window, not a dead or wounded person, that drove the North Carolina legislature. That cannot be. If the paramount concern here were property, there would have been no need for the statute to require that the building be occupied.

Equally, we should understand what this crime is not. The North Carolina statute does not cover the discharge of a firearm into an unoccupied building. It does not cover discharges into buildings that only contain valuable items. It does not shield buildings housing only livestock. Rather, it guards structures with people inside. See James, 466 S.E.2d 710, 715; see also Mancuso, 364 S.E.2d at 362 ("We cannot believe that the Legislature intended that a person should escape liability for this crime by sticking his weapon inside the occupied property before shooting."); State v. Wall, 286 S.E.2d 68, 73-74 (1982) ("It is an inherently incredible proposition that defendant could have intentionally fired a shot 'at' the fleeing [vehicle] without

27

intending that the bullet go 'into' the vehicle."). These distinctions are not "distractions." Maj. Op. at 13. The North Carolina courts have emphasized time and again the presence of occupants who might have been struck by a bullet. See, e.g., State v. Everette, 652 S.E.2d 241, 243-45 (N.C. 2007); State v. Canady, 664 S.E.2d 380, 385 (N.C. Ct. App. 2008); State v. Fletcher, 481 S.E.2d 418, 423 (N.C. Ct. App. 1997).

Ordinarily, the North Carolina courts have explained, someone convicted of this crime was aiming at one of two possible targets: (1) a property occupied by another person, or (2) a person who evaded the bullet, which then ended up in an occupied property. State v. Byrd, 510 S.E.2d 410, 412 (N.C. Ct. App. 1999); Canady, 664 S.E.2d at 383-84; see State v. Wheeler, 365 S.E.2d 609, 610-11 (N.C. 1988) (finding that firing at an occupied vehicle provided evidence that the defendant had meant to shoot into that occupied vehicle); Fletcher, 481 S.E.2d at 423 (applying the doctrine of transferred intent where the defendant had meant to shoot a particular person, but instead hit an occupied home). Those are the two realistic scenarios envisioned by the North Carolina courts. Duenas-Alvarez, 549 U.S. at 193. Under either scenario, the defendant deliberately shot in the direction of another person. Even if no one was actually struck, the defendant fired the bullet toward a location where he knew or believed another person to be.

28

Parral-Dominguez and the majority make much of the point that the North Carolina statute does not require that the bullet come near the occupant or that the occupant be aware of the danger. See Appellant's Br. at 8, 14-16, 19, 21, 25 n.8, 27-28; Maj. Op. at 11-12, 15. But imposing such restrictions would simply add conditions to § 2L1.2 that are nowhere therein. That Guidelines provision does not purport to demand that a bullet come within a specified number of yards of a person, or that the person in turn be aware of the shooter's presence. In fact, many shooters do not want their intended victims to have such awareness. In essence, Parral-Dominguez edges too close to a requirement that the use, attempted use, or threatened use of force against another person somehow requires waiting around for that person to actually be struck.

Not to worry, says the majority: firing into an occupied building creates no more than a "risk" that someone inside will be hurt or killed. And, says the majority, creating a mere "risk" of injury or death was a feature of the now-defunct residual clauses of the ACCA and § 4B1.2, the career-offender provision of the Guidelines, but it is not a feature of § 2L1.2, the illegal-reentry provision at issue here. See Maj. Op. at 9-10. But this is an insouciance that would leave only Alfred E. Neuman pleased. For the majority has done nothing more than assume the awkward position that every felony that creates a mere risk of serious human harm

29

is thereby automatically excluded from the reach of § 2L1.2. But § 2L1.2 must be applied on its own terms. It defines a "crime of violence" as having "as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 2L1.2 cmt. n.1(B)(iii). Firing into an occupied building, knowing it is occupied, involves the use, <u>attempted</u> use, or <u>threatened</u> use of force against that very person, whether the "risk" is realized or whether it is not. The discharge is a use. It can be much more than an "attempt." <u>See</u> <u>Black's Law Dictionary</u> 152-53 (10th ed. 2014). It is at the very minimum a "threat." <u>See</u> <u>id.</u> at 1708-09. And the threat is not directed at the outer ether, but against the person inside.

## C.

Tellingly, one of our sister circuits has steadfastly recognized the violent character of this behavior. The majority's conclusion stands in conflict with that line of decisions. <u>See</u> <u>United States v. Womack</u>, 732 F.3d 745, 748-49 (7th Cir. 2013); <u>United States v. Johnson</u>, 680 F.3d 966, 983-84 (7th Cir. 2012); <u>United States v. Curtis</u>, 645 F.3d 937, 940-43 (7th Cir. 2011); <u>United States v. Rice</u>, 520 F.3d 811, 820-21 (7th Cir. 2008); <u>Quezada-Luna v. Gonzales</u>, 439 F.3d 403, 406-07 (7th Cir. 2006). In each of these decisions, the Seventh Circuit found that a violation of the relevant Illinois statute involved the use of force against another person. And like the North Carolina statute, the Illinois

30

statute prohibits the discharge of a firearm at or into a building, or in the direction of a vehicle, that the shooter "knows or reasonably should know" is occupied. 720 Ill. Comp. Stat. § 5/24-1.2(a)(1)-(2).

The Seventh Circuit has emphasized that the Guidelines' coverage "is not limited to the use of force" only, but rather "includes attempted and threatened uses" of force as well. Curtis, 645 F.3d at 941. Whether the defendant fires at an occupied vehicle, see id., or an occupied building, see Womack, 732 F.3d at 749, the Seventh Circuit views this conduct as "unquestionably the use, attempted use, or threatened use of 'physical force against the person of another,'" Curtis, 645 F.3d at 941 (emphasis added). Although the majority suggests that the Seventh Circuit was concerned with the "smaller target" of a vehicle, see Maj. Op. at 13 n.8, in fact that court has specified that "the analysis is the same" for discharges into occupied buildings and occupied vehicles alike, Womack, 732 F.3d at 749. I agree with the reasoning of those cases.

To repeat, Parral-Dominguez's crime plainly amounts to "the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 2L1.2 cmt. n.1(B)(iii). The majority tries to make it appear as though the North Carolina offense could be a recklessness crime, but the mens rea here is ample. The whole emphasis of the North Carolina courts has been

31

upon intentional action. See, e.g., Wheeler, 365 S.E.2d at 611. And even if the majority had pointed to a conviction of someone who only had "reasonable grounds to believe that the building might be occupied by one or more persons," it is hardly an absolution that a person with such a belief did not cease and desist, but commenced firing.

Finally, and for good measure, the North Carolina statute is even located in the subchapter of the state's criminal code covering "Offenses Against the Person," and within the article demarcating various "Assaults." N.C. Gen. Stat. ch. 14, subch. III, art. 8 (emphasis added). Where else could it be? This provision applies when an individual deliberately fires into a building, a vehicle, or another property that he knows or believes to be occupied by someone else. The shooter is unleashing the force of a bullet "against" the person inside. True, the "'use'" of force "against" another "requires active employment," not "negligent or merely accidental conduct." Leocal v. Ashcroft, 543 U.S. 1, 9 (2004). But the majority could scarcely maintain that intentionally shooting into an occupied structure involves a negligent or accidental discharge. On the contrary, this offense involves "an intentional action (e.g., intentionally discharging a firearm rather than pulling the trigger by mistake) performed with the knowledge or reasonable grounds to believe the act would

32

endanger the life or safety of others." State v. McLean, 712 S.E.2d 271, 278 (N.C. Ct. App. 2011) (emphasis in original).

So much for the "property" offense the majority has fantasized.

                                    III.

I do not believe the district court erred in any way in imposing a sentencing enhancement here for the prior commission of a crime of violence. But even if I could accept the majority's conclusion on that matter, any purported error here was harmless. "[P]rocedural errors at sentencing . . . are routinely subject to harmlessness review." Puckett v. United States, 556 U.S. 129, 141 (2009). From the record before us, the harmlessness of any error is quite clear.

First, the district court took into account a broad range of factors in determining Parral-Dominguez's sentence. Among its litany of considerations, the court noted: (1) he had continued to engage in criminal activity well beyond his prior convictions at the ages of sixteen, nineteen, and twenty-two; (2) at age twenty-six, in the events that precipitated his present federal indictment, he had been caught trafficking in cocaine; (3) he gave an alias to law enforcement officers; (4) he incurred four disciplinary infractions while incarcerated; (5) there was little indication that he had "grown up" or even now "underst[ood] the consequences of his decisions"; (6) he was a documented member of

33

the "La Rubia" street gang; (7) he had made no meaningful societal contribution and instead had gone from a "punk criminal" at age sixteen to a "drug dealer" at twenty-six; (8) over the years he had demonstrated a disregard for the rights and safety of other people and shown himself to be a "violent person"; (9) he had illegally returned to this country after being told he could not do so; and (10) his prior lenient treatment had done nothing to discourage his recent life choices. J.A. 83-84; see 18 U.S.C. § 3553(a).

The district court imposed a targeted sentence of sixty-five months' imprisonment, in the middle of the advisory Guidelines range. The fact that the sentence fell in the middle of that range, not at the bottom, indicates that the court did not find that range in some way inappropriate. Indeed, the district court nowhere stated that it imposed the sentence only because its hands were tied, a not uncommon expression if a judge feels frustrated by a directive to which she personally may take exception.

Second, the district court knew the sentence it wished to give and the sentence the crime deserved. A sentencing court need "not specifically state that it would give the same sentence absent the . . . enhancement." United States v. Savillon-Matute, 636 F.3d 119, 124 (4th Cir. 2011). Though it was not necessary, the district court did state that here. The court concluded emphatically at the sentencing hearing: "I think it's only a sentence of 65 months

34

that sends the message that the defendant will be punished for his actions and his conduct, that he must respect the law, that his dangerousness must be mitigated, and he cannot come back into this country." J.A. 84. This is not "stray phrasing," as the majority reckons. Maj. Op. at 17. As if to underscore the point, the court paused after this statement and immediately asked Parral-Dominguez, "Do you understand that?" J.A. 84.

The district court, moreover, expressly rejected the defense's proposed sentence of thirty-eight months' imprisonment as insufficient. That shorter sentence, the court explained, would "not take into consideration his history and characteristics, nor does it reflect enough on the need to promote respect for the law, to discourage this type of conduct and to protect the public from Edgar Parral-Dominguez." J.A. 84. Declarations such as these certainly constitute a "consistent indication" that the district court "would have reached the same result even if it had decided the guidelines issue the other way." Savillon-Matute, 636 F.3d at 124; see also id. (noting that the district court had "'absolutely'" thought the imposed sentence was appropriate). The majority chides the district court for not expressly offering an alternative sentence in the event of a Guidelines miscalculation. Maj. Op. at 17. But we do not require such clairvoyance. It is surely enough if, as the majority's own authority indicates, the court makes it "abundantly clear that it would have imposed the

35

same sentence . . . regardless of the advice of the Guidelines." United States v. Gomez-Jimenez, 750 F.3d 370, 382 (4th Cir. 2014).

Third, there was nothing unreasonable about this sentence. Even if we "initially give [Parral-Dominguez] the benefit of the doubt and assume" that a lower advisory Guidelines range should have applied to him, an upward variance from that range still would have been reasonable. Savillon-Matute, 636 F.3d at 124 (internal quotation marks omitted). An appellate court "may not apply a presumption of unreasonableness" to a sentence outside the Guidelines range. Gall v. United States, 552 U.S. 38, 51 (2007). Instead, we accord "due deference" to the assessment formed by the district court, which as an institutional matter has far greater familiarity than we do with the case and the defendant. Id.; see Savillon-Matute, 636 F.3d at 124. The district court here provided a meticulous explanation for its individually tailored sentence. Any decent respect for the role of district courts in matters of sentencing would have let this sentence stand.

IV.

Our society has been tragically punctuated by violent outbursts that may only come with greater frequency in future months and years. This should not cause appellate judges to lose their heads. It should, however, induce some minimal respect for the intentions of Congress as to the most violent sorts of behaviors, a respect that is woefully AWOL in this case.

36

There is nothing inherent in the categorical approach to sentencing that is inconsistent with the recognition of violent criminality. Indeed, that approach is essential to sound sentencing. Among other things, it relieves district courts of the huge burden of rummaging through the often murky particulars of old predicate convictions. But the categorical approach was always intended to express a neutral principle, or rather to strike a balance between not burdening defendants convicted under statutes with nonviolent applications on the one hand and not undercutting Congress's articulated desire to punish the most violent offenders on the other. Too often, as here, that approach has become code for invariable categorical holdings of non-violence, even in the face of the Supreme Court's admonitions. See Descamps v. United States, 133 S. Ct. 2276, 2290 (2013) (noting that "every element of every statute can be imaginatively transformed"); Gonzales v. Duenas-Alvarez, 549 U.S. 183, 193 (2007) (requiring "more than the application of legal imagination to a state statute's language").

The categorical approach was never intended to have such a one-sided sweep. On the contrary, as the Supreme Court observed in delineating the categorical approach, there is simply no "indication that Congress ever abandoned its general approach, in designating predicate offenses, of using uniform, categorical definitions to capture all offenses of a certain level of seriousness that involve violence . . . , regardless of technical

37

definitions and labels under state law." <u>Taylor v. United States</u>, 495 U.S. 575, 590 (1990) (emphasis added). While punishment is seldom more than a partial answer to any problem, Congress here thought it a necessary part of the total mix. Yet the categorical approach has become over time little more than a mere ruse for removing serious qualifying felonies from the scope of a Guidelines "crime of violence" sentencing enhancement. The North Carolina statute is a prime example of one such felony. Firing into a building known or believed to be occupied by another person, <u>see</u> N.C. Gen. Stat. § 14-34.1(a), necessarily involves the use, attempted use, or threatened use (the discharge) of force (the bullet) against that person (the occupant) inside, <u>see</u> U.S.S.G. § 2L1.2 cmt. n.1(B)(iii).

> Question: "Is shooting into a building known to be occupied a crime of violence?"

> Answer: "Of course. Why would you ask?"

These crimes of violence represent profound defaults on the obligations that we as people owe one another. How sad, really, that courts contribute to the erosion of social structure and disintegration of communal peace by declining to recognize these crimes for what they are.

I respectfully dissent.