**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 14-4866

———————————

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

     v.

ALAN BOYD DONTA BARNETT, a/k/a Big Al,

              Defendant - Appellant.

———————————

No. 14-4885

———————————

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

     v.

SAMANTHA WILLIAMS, a/k/a Lady Sam, as Administrator of the
Estate of Samantha Wilkinson,

              Defendant - Appellant.

———————————

Appeals from the United States District Court for the Western
District of North Carolina, at Charlotte.  Frank D. Whitney,
Chief District Judge.  (3:12-cr-00188-FDW-DSC-2; 3:12-cr-00188-
FDW-DSC-27)

———————————

Argued:  March 24, 2016              Decided:  October 12, 2016

———————————

Before AGEE and WYNN, Circuit Judges, and Thomas D. SCHROEDER, United States District Judge for the Middle District of North Carolina, sitting by designation.

---

Affirmed in part and reversed in part by unpublished opinion. Judge Wynn wrote the opinion, in which Judge Agee and Judge Schroeder joined.

---

**ARGUED:** Joshua B. Carpenter, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Asheville, North Carolina; Jeffrey William Gillette, GILLETTE LAW FIRM, PLLC, Franklin, North Carolina, for Appellants. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Ross Hall Richardson, Executive Director, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Asheville, North Carolina, for Appellant Williams. Jill Westmoreland Rose, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

In 2012, the government indicted twenty-eight individuals for various crimes arising out of their alleged involvement with the gang United Blood Nation ("UBN"). Two of these individuals, Defendants Samantha Williams and Alan Barnett, proceeded to a joint trial. The jury convicted both Defendants of conspiring to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). Additionally, the jury convicted Barnett of conspiring to commit murder in aid of racketeering activity, two counts of conspiring to commit Hobbs Act robbery, and several drug-related offenses.

Defendants assert numerous errors related to their convictions and sentencing. We find no reversible error pertaining to Barnett and thus affirm his conviction and sentence. We conclude, however, that the government failed to produce sufficient evidence that Williams agreed to the commission of two racketeering acts forming a pattern of racketeering activity, as required by Section 1962(d). Accordingly, we reverse Williams's conviction for conspiracy to violate RICO.

I.

At trial, the government established the following facts. UBN was founded in 1993 at Rikers Island Prison in New York City, when two prisoners brought together several smaller groups

3

affiliated with the Bloods gang. UBN originally consisted of eight groups, called "sets," including the Gangster Killer Bloods, commonly known as "G-Shine." J.A. 262. At present, UBN's power structure remains in New York, but its membership has spread to other prisons and communities along the East Coast. The leader, or "godfather," of each set serves on the central council for the gang and directs set leaders in each state. J.A. 263. The gang operates through a hierarchical structure and a strict set of rules.

A.

Defendant Barnett was the second highest ranking member of the G-Shine set in North Carolina. In the G-Shine hierarchy, Barnett was directly under Franklin Robbs, the leader of G-Shine in North Carolina, who in turn reported to Daryl Wilkinson. Wilkinson—-also known as "OG Powerful," "Infinity Q45," and by various other names—-was the godfather of G-Shine during the relevant time period and was incarcerated in New York.

The government monitored a wiretap on Barnett's phone for roughly 90 days and surveilled Barnett and other UBN members for years. At trial, the government submitted audio recordings of over two dozen calls collected as part of the wiretap. On one of those phone calls, described in greater detail below, see infra Part III.A, Barnett and other UBN members discussed a plan for a UBN member to attack an individual named Deray Jackson.

4

Additionally, numerous witnesses, including several UBN members charged as co-conspirators, testified to Barnett's leadership role in G-Shine and his participation in robberies and drug trafficking. Several law enforcement officers also testified regarding instances in which they purchased drugs from Barnett using undercover agents.

The jury found Barnett guilty of RICO conspiracy, 18 U.S.C. § 1962(d); conspiracy to commit murder in aid of racketeering, 18 U.S.C. § 1959(a)(5); two counts of conspiring to commit Hobbs Act robbery, 18 U.S.C. § 1951; conspiracy to distribute and possession with intent to distribute cocaine base, 21 U.S.C. §§ 841(b)(1)(A), 846; illegal use of a communication device, 21 U.S.C. § 843(b); and distribution of cocaine, 21 U.S.C. § 841(b)(1)(C). The court sentenced Barnett to 360 months in prison.

B.

At the time of the events giving rise to this case, Williams was Wilkinson's girlfriend and "first lady"—which, in UBN parlance, is "the mouthpiece . . . for [a] high ranking male member if he's incarcerated." J.A. 291, 293. At trial, the government introduced letters between Williams and Wilkinson and recordings of calls among Williams and other alleged UBN members. Although the government monitored roughly 17,000 phone calls through its wiretap on Barnett, and thousands more through

5

wiretaps on other UBN members, Williams participated in less than ten of the calls.

To meet its burden to prove that Williams agreed that UBN members would commit at least two racketeering acts, the government introduced evidence regarding alleged conspiracies: (1) to commit the murders of Kellie Star, a UBN member who had belonged to several different sets; Robbs, the leader of G-Shine in North Carolina; and an individual named Dread; and (2) to extort UBN members by requiring them to pay dues. See infra Part IV. The government also introduced evidence regarding various robberies and drug crimes committed by UBN members, though, as the government concedes, none of that evidence directly related to Williams. Appellee's Br. at 54–55.

At the close of trial, the jury found Williams guilty of conspiring to violate RICO. In its verdict, the jury concluded that Williams agreed that at least two specific racketeering acts would be committed as part of the UBN conspiracy. However, in accordance with the verdict form and the court's instructions, the jury did not identify which two acts formed the basis of its verdict. The court sentenced Williams to seventy-two months in prison.

## II.

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of

6

which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). A "pattern of racketeering activity" is defined as "at least two acts of racketeering activity" occurring within a ten-year period. 18 U.S.C. § 1961(5). These "so-called predicate acts," Salinas v. United States, 522 U.S. 52, 62 (1997), include "any act or threat involving murder, . . . robbery, . . . extortion, . . . or dealing in a controlled substance . . . , which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A).

The jury convicted Barnett and Williams of violating 18 U.S.C. § 1962(d), which prohibits conspiring to commit the substantive RICO offense, Section 1962(c). "[T]o satisfy § 1962(d), the government must prove [1] that an enterprise affecting interstate commerce existed; [2] 'that each defendant knowingly and intentionally agreed with another person to conduct or participate in the affairs of the enterprise; and [3] . . . that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts.'" United States v. Mouzone, 687 F.3d 207, 218 (4th Cir. 2012) (quoting United States v. Wilson, 605 F.3d 985, 1018–19 (D.C. Cir. 2010)). Unlike the general conspiracy

7

provision applicable to federal crimes, 18 U.S.C. § 371, Section 1962(d) does not require any overt or specific act to be committed in furtherance of the conspiracy. Salinas, 522 U.S. at 64. An agreement is sufficient. Id.

Additionally, the two predicate acts must form "a pattern of racketeering activity", 18 U.S.C. § 1962(c), which means the acts must be "related" and "pose a threat of continued criminal activity." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989). This two-prong "continuity plus relationship" test requires a "commonsensical, fact-specific approach to the pattern requirement." Menasco, Inc. v. Wasserman, 886 F.2d 681, 684 (4th Cir. 1989). This effectuates "Congress's desire to limit RICO's application to 'ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.'" US Airline Pilots Ass'n v. Awappa, LLC, 615 F.3d 312, 318 (4th Cir. 2010) (quoting Al-Abood ex rel. Al-Abood v. El-Shamari, 217 F.3d 225, 238 (4th Cir. 2000)).

Defendants raise numerous challenges to their convictions and sentences, both individually and jointly. We first address Barnett's assignments of error and then address those raised by Williams.

8

III.

A.

Barnett first asserts that there was insufficient evidence to support his conviction under 18 U.S.C. § 1959 for conspiring to murder Deray Jackson in order to maintain or increase his position in UBN. We disagree.

"We review de novo the district court's ruling on a motion for judgment of acquittal and we will uphold the verdict if, viewing the evidence in the light most favorable to the government, it is supported by substantial evidence." United States v. Kingrea, 573 F.3d 186, 194 (4th Cir. 2009) (quotation omitted). "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id. at 194–95 (internal quotation omitted). "While circumstantial evidence may sufficiently support a conspiracy conviction, the Government nevertheless must establish proof of each element of a conspiracy beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 858 (4th Cir. 1996).

Barnett's conviction for conspiracy to commit murder in aid of racketeering rested primarily on a June 23, 2011, phone call among Barnett and several inmates at the Bertie Correctional Center in North Carolina. An inmate named Joseph Gray added Barnett to the call to discuss the "insubordination" of fellow

9

G-Shine member Nathaniel Graham.  J.A. 1639.  Barnett and other participants on the call discussed the fact that Deray Jackson, an inmate who was not affiliated with UBN, had stolen a cell phone.  In response, Gray and others had ordered Graham to "eat" Jackson and, in addition, made clear that "[t]his was his day to die."  J.A. 1651, 1654.  Graham did not immediately carry out this order, angering Gray and prompting the call.

Graham's hesitation to follow orders brought to the forefront internal strife involving two subsets of G-Shine—- Pretty Tony and Black Gangsta Bloods ("BGB")—-that Robbs and Barnett were attempting to bring under the UBN umbrella. Barnett and certain other G-Shine members viewed Pretty Tony and BGB as part of G-Shine.  Other members of G-Shine, however, were less welcoming to the new subsets, neither of which was officially added to UBN by Wilkinson, G-Shine's godfather. During the phone call, the inmates discussed their annoyance that others in UBN did not "accept the fact that [Pretty] Tony is Shine now" and not "a[n] individual entity."  J.A. 1637. Graham, who was affiliated with G-Shine and BGB, had failed to follow an order from high-ranking members of Pretty Tony and had expressed doubt over their authority.

On the call, Barnett—-who was identified as a high-ranking member of BGB—-scolded Graham for failing to follow orders, stating that "Pretty Tony is Shine" and "[y]ou ain't even

10

supposed to hesitate to eat the plate from the beginning." J.A. 1637, 1643, 1652. When another participant on the call asked why Jackson had not yet been shot, Barnett responded "more east," J.A. 1653, which is a UBN term indicating understanding or agreement.

Four days after the call, Jaimel Davidson, a member of G-Shine, violently assaulted Jackson with a "slashing weapon." J.A. 924. Graham was present at the attack. Based on the evidence presented, the jury convicted Barnett of conspiring to murder Jackson, in violation of 18 U.S.C. § 1959.

1.

To convict a defendant of conspiracy to commit murder in aid of racketeering, the jury must find beyond a reasonable doubt:

> (1) that the organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant [conspired to] commit[] the alleged crime . . . , and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise.

United States v. Fiel, 35 F.3d 997, 1003 (4th Cir. 1994) (quoting United States v. Concepcion, 983 F.2d 369, 381 (2d Cir. 1992)).

Here, the organization identified in the indictment is UBN. Barnett asserts that the alleged conspiracy to murder Jackson

11

(1) "was outside the scope of the UBN" because it was solely a BGB conspiracy, Appellants' Br. at 47, and (2) "did not maintain or increase Barnett's alleged position within the UBN," id. at 48. We address each of these contentions in turn.

First, we find that a rational juror could have found, beyond a reasonable doubt, that the conspiracy was related to UBN—-and not to BGB alone. At trial, Barnett was identified as both the second-in-command of G-Shine in North Carolina and a high-ranking member of BGB. There is no evidence that Barnett quit or was forced out of G-Shine when he began his affiliation with BGB. Witnesses described BGB as a "set inside a set" and characterized BGB as a subset of G-Shine rather than a new, separate entity. J.A. 709-10. Indeed, Barnett and other BGB members considered themselves to be G-Shine (and thus UBN) members.

Consistent with this evidence, participants on the call repeatedly affirmed that they were members of both G-Shine and their respective subsets. They also stated that Pretty Tony and BGB were part of G-Shine. For instance, Barnett stated, "Pretty Tony is Shine . . . and that ain't gonna change." J.A. 1643; see also J.A. 1659 (in which Gray asserted, "I'm looking at everybody as Shine"). Additionally, the participants on the call greeted each other with the phrases "shine love" and "shine

loyalty," which were identified multiple times at trial as being used only by and between members of G-Shine.

Barnett correctly points out that G-Shine's leadership, and Wilkinson in particular, opposed incorporating Pretty Tony and BGB into UBN. However, the record is unclear as to precisely when and how Wilkinson rendered this decision. Even if Wilkinson clearly excluded BGB from G-Shine, there is no evidence that it happened before the conspiracy to murder Jackson arose.

In sum, a reasonable juror could have concluded that the conspiracy to murder Jackson was related to UBN.

2.

Second, Barnett argues that he did not participate in the conspiracy "for the purpose of . . . maintaining or increasing [his] position in" UBN, as required by 18 U.S.C. § 1959. United States v. Ayala, 601 F.3d 256, 265 (4th Cir. 2010). The purpose requirement is "satisfied if the jury could properly infer that the defendant committed his . . . crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." Fiel, 35 F.3d at 1004 (quoting Concepcion, 983 F.2d at 381).

For instance, in United States v. Tipton, the defendant claimed that his violent actions were motivated by a desire to get revenge for "a purely personal grievance." 90 F.3d 861, 891

13

(4th Cir. 1996). Rejecting the defendant's argument, we found the evidence sufficient to support the jury's determination that the actions were committed for the purpose of maintaining or increasing his position within the racketeering enterprise. Id. In particular, we emphasized that the attacks were carried out "in part at least in furtherance of the enterprise's policy of treating affronts to any of its members as affronts to all" and because "furthering the reputation for violence [is] essential to maintenance of the enterprise's" reputation. Id. Furthermore, retaliatory attacks were "critical to the maintenance of one's position in the enterprise." Id.

Under Fiel and Tipton, there was sufficient evidence that Barnett's participation in the plan to murder Jackson helped him to maintain or increase his position in UBN. Barnett's position as a high-ranking member of UBN relied, at least in part, upon other members of UBN following his and his superiors' orders. The evidence at trial suggested that UBN uses a strict, almost militaristic hierarchy. Maurice Robinson, a UBN member, testified that if a gang member is given an order he must follow it, regardless of what the order is and that failure to do so would be in violation of the organization's policies. Indeed, respecting the "chain of command" was one of UBN's "most important" rules. J.A. 271-72.

14

Consistent with this rule, Barnett emphasized on the call the importance of following the chain of command and obeying the orders of superiors within the gang. Barnett instructed Graham not to hesitate when following an order and agreed that "[i]nsubordination [would] not be tolerated!" J.A. 1646. Enforcing G-Shine's hierarchy in this manner was not only expected of Barnett, but also was "in furtherance of the enterprise's policy" and reputation. Tipton, 90 F.3d at 891.

In conclusion, there was sufficient evidence to support a finding, beyond a reasonable doubt, that Barnett conspired to murder Jackson for the purpose of maintaining or increasing his position in UBN. Accordingly, we affirm Barnett's conviction under 18 U.S.C. § 1959.

## B.

Barnett further argues that the district court erroneously allowed Steven Parker, a detective with the Charlotte-Mecklenburg Police Department who assisted the FBI in investigating UBN, and UBN members Maurice Robinson and Rafus Camp to testify regarding the meaning of slang words used on recorded phone calls.[1] In particular, Barnett argues that lay

---

[1] Williams also challenges this evidentiary decision. Because we conclude that the government failed to introduce sufficient evidence to support Williams's conviction, see infra Part IV, we need not—and thus do not—address whether the
(Continued)

15

witnesses—-i.e., those who have not been certified as experts—- are not permitted to interpret calls in this way unless they personally observed or participated in the calls in question.

We review challenges to a trial court's evidentiary rulings for abuse of discretion. United States v. Hassan, 742 F.3d 104, 130 (4th Cir. 2014). "A court has abused its discretion if its decision is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." United States v. Johnson, 617 F.3d 286, 292 (4th Cir. 2010) (internal quotation marks omitted). Even if the district court errs, we will not reverse if the error was harmless. United States v. McLean, 715 F.3d 129, 143 (4th Cir. 2013) (citing Fed. R. Crim. P. 52). An error is harmless if we can say "with fair assurance" that "the judgment was not substantially swayed by the error." Id. (quoting United States v. Heater, 63 F.3d 311, 325 (4th Cir. 1995)).

Even assuming that the district court erred in admitting the challenged testimony, the error would not have substantially swayed the jury's verdict as to Barnett. Barnett's claim is limited to interpretations by Parker, Robinson, and Camp of phone calls in which they did not personally participate.

district court reversibly erred in admitting this challenged evidence against her.

16

Barnett does not challenge the portions of these three witnesses' and others' testimony that simply defined slang terms used by the gang; rather, he challenges only the application of those definitions to "translate" a statement on a particular phone call. The challenged testimony, then, was often cumulative and presented an interpretation of the phone calls that the jury almost certainly would have reached on its own by using the unchallenged definitions of gang terms.

Barnett specifically identifies only one challenged statement that pertained to him: Parker's testimony that the term "eat the plate," when used in Barnett's June 23, 2011, phone call with inmates at Bertie Correctional Center, meant to follow an order—-in this case to "kill Deray Jackson." J.A. 402. Several other witnesses testified that "eat the plate" meant to carry out an order and that gang members could be ordered to attack or even kill an identified person. And additional statements on the phone call made clear that Jackson was supposed to be shot and killed. See, e.g., J.A. 1654 ("This was his day to die. Today was his day."); J.A. 1653 (asking "why [Jackson] ain't been got shot"); J.A. 1661 (discussing that the intention had been for Jackson to "die"). Given these statements, the jury almost certainly would have reached the conclusion that Graham had been ordered to kill Jackson—-even absent Parker's purported interpretation of the phone call.

17

Reviewing the remainder of the testimony, we find no instances in which Parker, Robinson, or Camp interpreted a phone call in a way that was not either obvious from the plain language or easily understandable based on the definitions of gang terms introduced at trial without objection. In addition, we note that there was abundant evidence to support Barnett's convictions even if these lay witness interpretations had been excluded. Therefore, we conclude with fair assurance that any error in admitting the challenged testimony did not substantially sway the jury's verdict regarding Barnett.

C.

Barnett next asserts that the district court erroneously instructed the jury regarding the "pattern of racketeering activity" required for a RICO conspiracy conviction. 18 U.S.C. § 1962(c).[2] Barnett argues that the jury instructions failed to adequately explain that "predicate acts that show a pattern of criminal activity must be related to the racketeering enterprise." Appellants' Br. at 53. Without clarifying

---

[2] Barnett also argues that the jury instruction defining extortion was plainly erroneous. At the time of briefing, Barnett admitted that the jury instructions conformed to this Court's opinion in United States v. Ocasio, 750 F.3d 399 (4th Cir. 2014), but wished to preserve the issue pending Supreme Court review. Appellants' Br. at 54. The Supreme Court affirmed Ocasio, Ocasio v. United States, 136 S. Ct. 1423, 1429 (2016), foreclosing this argument.

18

language, Barnett claims, the jury may have based his RICO conspiracy conviction on criminal acts related to the six other counts for which he was tried, even if those acts had no relation to UBN.  We disagree.

At trial, Barnett proposed the following jury instruction:

> The defendant knowingly and willfully became a member of the conspiracy to further the racketeering activities of the enterprise.  A conspiracy must intend to further an endeavor which, when completed, would satisfy all of the elements of the substantive racketeering offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.  However, defendant and partners in the criminal plan must agree and pursue to the same criminal objective.

J.A. 1360.  The district court rejected this instruction. Barnett later argued for an instruction clarifying that criminal acts unrelated to UBN could not be predicate acts for a RICO conspiracy.  To accommodate this request, the district court added a line to the jury instructions, so that the final version read, in relevant part:

> Proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the superseding indictment . . . .  Random criminal acts unrelated to the conspiracy are not proof of a RICO conspiracy.  If you find that one or more of the defendants was not a member of or associated with the conspiracy charged, then you must find that defendant not guilty, even though that defendant may have been a member of some other conspiracy.  This is because proof that a defendant was a member of some other conspiracy is not enough to be convicted.

J.A. 1489.

19

In addition to this passage, the final jury instructions thoroughly discussed the elements of RICO conspiracy. Using language similar to the rejected jury instruction proposed by Barnett, the instructions stated that the defendant must have "knowingly and willfully bec[o]me a member of the conspiracy to further the unlawful purposes of the enterprise," J.A. 1475, and "knowingly adopted the goal of furthering or facilitating the enterprise," J.A. 1488. Additionally, the court instructed that "the government must prove beyond a reasonable doubt that a particular defendant agreed that a member of the conspiracy did or would commit at least two acts of racketeering of the type or types as described in count one of the superseding indictment." J.A. 1481–82. The instructions further provided that "[t]he government must prove beyond a reasonable doubt that at least two of these acts were, or were intended to be, committed as part of the conspiracy." J.A. 1482 (emphasis added).

Barnett argues that the district court erred in refusing his proposed jury instruction and failed to adequately instruct the jury about the elements of RICO conspiracy. "We review a district court's decision to give or refuse to give a jury instruction for abuse of discretion." United States v. Smith, 701 F.3d 1002, 1011 (4th Cir. 2012). We must "determine whether, taken as a whole, the instruction fairly states the controlling law." United States v. Moye, 454 F.3d 390, 398 (4th

20

Cir. 2006) (en banc) (internal quotation marks omitted).  If the instructions contain an "error of law," the district court has abused its discretion.  Id.

When the district court rejects a proposed instruction, we reverse only if that instruction "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense."  Smith, 701 F.3d at 1011 (quoting United States v. Passaro, 577 F.3d 207, 221 (4th Cir. 2009)).

Here, the challenged jury instructions, considered as a whole, fairly and accurately state controlling law.  The instructions made clear that the predicate acts for a RICO conspiracy had to be part of the charged RICO conspiracy and not "[r]andom criminal acts unrelated to the conspiracy" or evidence related to "some other conspiracy."  J.A. 1489.  Although the instructions may not have "reinforce[d] this requirement" as frequently as Barnett would have liked, Appellants' Br. at 52 n.10, we presume that the jury followed the instructions as given, Richardson v. Marsh, 481 U.S. 200, 211 (1987).  Thus, the district court did not abuse its discretion by giving its jury instructions on RICO's pattern-of-racketeering element.

21

The district court likewise did not abuse its discretion in rejecting Barnett's proposed jury instruction. As an initial matter, we do not see—-nor does Barnett explain—-how his proposed instruction would have clarified the requirement that the predicate racketeering acts must be related to the RICO conspiracy. Instead, the proposed instruction restates other elements of RICO conspiracy that were defined elsewhere in the final jury instructions. Accordingly, its absence did not impair Barnett's ability to conduct his defense. See Smith, 701 F.3d at 1011.

In sum, we affirm Barnett's RICO conspiracy conviction.

D.

Finally, Barnett argues that the district court improperly sentenced him as a career offender pursuant to section 4B1.1 of the United States Sentencing Guidelines (the "Guidelines"). According to Barnett, Johnson v. United States, 135 S. Ct. 2551, 2555-57 (2015), which struck down the residual clause of the Armed Career Criminal Act ("ACCA") as unconstitutionally vague, effectively invalidated the residual clause in the Guidelines' definition of "crime of violence," U.S.S.G. § 4B1.2. Barnett contends that, without the residual clause, he did not have "at least two prior felony convictions of either a crime of violence or a controlled substance offense," which are necessary predicates to a career offender designation. Id. § 4B1.1(a).

22

"[W]e review the district court's sentencing procedure for abuse of discretion." United States v. Gomez-Jimenez, 750 F.3d 370, 379 (4th Cir.), as corrected (Apr. 29, 2014). First, we "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range." Gall v. United States, 552 U.S. 38, 51 (2007). If we find no procedural error, we then "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." Id.

"[H]armless error review applies to a district court's procedural sentencing errors made during its Guidelines calculation." Gomez-Jimenez, 750 F.3d at 382. Thus, "we commonly assume, without deciding, an error in performing harmless error inquiry." United States v. Savillon-Matute, 636 F.3d 119, 123 (4th Cir. 2011). A "Guidelines error is harmless if we believe (1) the district court would have reached the same result even if it had decided the guidelines issue the other way, and (2) the sentence would be [substantively] reasonable even if the guidelines issue had been decided in the defendant's favor." United States v. Parral-Dominguez, 794 F.3d 440, 447 (4th Cir. 2015) (alteration in original) (internal quotation marks omitted).

Even assuming that Barnett's designation as a career offender was in error,[3] that error was harmless. During sentencing, the district court determined, over Barnett's objection, that he was a career offender. Pursuant to section 4B1.1 of the Guidelines, the district court placed Barnett in criminal history category VI, the same category that he would have been assigned absent the career offender designation. U.S.S.G. § 4B1.1(b). The district court also had to assign Barnett the greater of "the offense level otherwise applicable," which was 41, and the offense level prescribed in the career offender guideline, which was 37. Id. Thus, regardless of whether he was labeled a career offender, Barnett had an offense

---

[3] In declining to address this issue, we do not imply that Barnett's contention lacks merit. Johnson concerned the ACCA, but it also called into question the constitutionality of the identical residual clause contained in the career offender guideline's definition of "crime of violence." See United States v. Hudson, 823 F.3d 11, 18 (1st Cir. 2016) (stating that the residual clause in the career offender guideline is invalid following Johnson); United States v. Madrid, 805 F.3d 1204, 1210–11 (10th Cir. 2015) (holding that the residual clause in the career offender guideline is unconstitutionally vague pursuant to the reasoning in Johnson). Some of Barnett's predicate crimes—-including common law robbery and robbery with a dangerous weapon—-may have fallen within the residual clause. See United States v. Gardner, 823 F.3d 793, 803–04 (4th Cir. 2016) (holding that North Carolina common law robbery qualified as a violent felony under the now-unconstitutional residual clause of the ACCA, and is no longer within the definition of a violent felony post-Johnson); United States v. White, 571 F.3d 365, 369, 373 (4th Cir. 2009) (holding, pre-Johnson, that conspiracy to commit robbery with a dangerous weapon fell within the ACCA's residual clause).

24

level of 41 and a criminal history category of VI, leading to a Guidelines range of 360 months to life imprisonment. The court sentenced Barnett to 360 months in prison, the bottom end of the Guidelines range.

Even if the career offender designation had affected Barnett's Guidelines range—-which it did not—-the district court made clear that it still would have sentenced Barnett to 360 months in prison. In particular, the district court pronounced, as an alternative grounds for the sentence, that, "based solely on the sentencing factors without consideration of the sentencing guidelines, particularly with emphasis on [the] nature and circumstances of the offense, general and specific deterrence, the Court does believe that a 360-month sentence is the appropriate sentence." J.A. 1826–27. Language of this sort "make[s] it 'abundantly clear' that a judge would have imposed the same sentence, regardless of any procedural error." Parral-Dominguez, 794 F.3d at 447–48 (quoting Savillon-Matute, 636 F.3d at 382–83); see also Gomez-Jimenez, 750 F.3d at 382–83 (citing a similar pronouncement as evidence that the court would have imposed the same sentence regardless of the Guidelines range).

Having determined that the district court "would have reached the same result" even if it had not sentenced Barnett as a career offender, we next assess whether the sentence was substantively reasonable. See Parral-Dominguez, 794 F.3d at

25

447. To do so, we "examine[] the totality of the circumstances to see whether the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in [18 U.S.C.] § 3553(a)." Gomez-Jimenez, 750 F.3d at 383 (quoting United States v. Mendoza-Mendoza, 597 F.3d 212, 216 (4th Cir. 2010)) (first alteration in original). "[A] sentence located within a correctly calculated guidelines range is presumptively reasonable." United States v. Susi, 674 F.3d 278, 289 (4th Cir. 2012) (internal quotation marks omitted).

Here, the district court thoroughly examined the factors in Section 3553(a) and imposed a sentence at the bottom of the Guidelines range. We find this sentence to be substantively reasonable and not an abuse of discretion.

Finding no reversible error relating to Barnett, we affirm his convictions and sentence.

## IV.

Williams principally challenges on appeal the sufficiency of the evidence supporting her conviction for conspiring to violate RICO. As outlined above, "we will uphold [a] verdict if, viewing the evidence in the light most favorable to the government, it is supported by substantial evidence." Kingrea, 573 F.3d at 194; see supra Part III.A.

Williams claims that the government failed to introduce sufficient evidence that she agreed that UBN members would

26

commit the two racketeering acts necessary to establish a pattern of racketeering activity. By contrast, the government claims it produced evidence sufficient to establish that Williams agreed that she or another member of UBN would commit (1) robberies and drug crimes, (2) extortion and (2) the murders of Star, Robbs, and Dread.

To be convicted for RICO conspiracy, "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." Salinas, 522 U.S. at 65; Burgos, 94 F.3d at 858 ("[T]he Government . . . must establish proof of each element of a conspiracy beyond a reasonable doubt."). Accordingly, we must determine whether a reasonable juror could conclude, beyond a reasonable doubt, that the government established each element of the substantive offense for at least two of Williams's alleged predicate acts.

1.

The government first argues that Williams's RICO conspiracy conviction is supported by her alleged agreement that UBN members would commit predicate racketeering acts of robbery and drug trafficking. The government states: "Because Williams played a central role in the gang as the primary source and conduit of information and as an advisor integral to the success and coordination of gang activities, the jury could reasonably

27

infer that she was aware that UBN members engaged in drug trafficking and committed robberies." Appellee's Br. at 54–55. The government concedes that it "did not present direct evidence that Williams personally participated in any such acts," and it fails to point to any specific act of drug trafficking or robbery to which Williams agreed. Id. at 54.

This general assertion cannot constitute substantial evidence that Williams knowingly and willfully agreed to the commission of a robbery or drug trafficking offense and, thus, is insufficient to prove a predicate racketeering act. See Mouzone, 687 F.3d at 218 (holding that the government must prove that "each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts." (quoting Wilson, 605 F.3d at 1018–19)). "[T]he RICO conspiracy statute does not 'criminalize mere association with an enterprise.'" Id. (quoting Brouwer v. Raffensperger, Hughes & Co., 199 F.3d 961, 965 (7th Cir. 2000)). Were we to accept the government's argument, almost any individual affiliated with a gang could be presumed to know about and agree to the commission of racketeering acts generally and therefore be guilty of conspiring to violate RICO. See United States v. Izzi, 613 F.2d 1205, 1210 (1st Cir. 1980) ("Guilt by association is one of the ever present dangers in a conspiracy count that covers an extended period."). We decline

28

the government's invitation to broaden RICO's scope in this manner.

Without any evidence showing that Williams agreed to the commission of a particular robbery or drug offense, no reasonable juror could find, based solely on her association with UBN, that she agreed to predicate acts of drug trafficking or robbery.

2.

Second, the government alleges that Williams agreed to—-and personally carried out—-the predicate racketeering act of extortion by facilitating the collection of certain dues from UBN members. Extortion, as defined by 18 U.S.C. § 1951, is a predicate racketeering act under RICO. Id. § 1961(1). Under Section 1951, extortion "means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Id. § 1951(b)(2).

The government's principal evidence supporting Williams's alleged involvement in extortion was an email sent from Williams's professional email address to her personal email address. The email—-styled as a letter entitled "Reaching Back for the Iced Out Soldiers"—-discusses a "mandatory" dues program for G-Shine members, through which they "reach back" to support

29

incarcerated gang members and their families. J.A. 1685b.[4] According to the message, higher-ranking G-Shine members owed fifty dollars each month in dues. Higher-ranking members who failed to pay their dues would "be demoted." J.A. 1685b–c. Members without rank owed twenty dollars a month. The dues were to be "collected and recorded by Brazy (Sam) or Sam as most of you know her." J.A. 1685c. The letter concludes by stating that "any games being played will result to sanctions being admin[i]stered." J.A. 1685c. It was signed using nicknames and titles associated with Wilkinson. The government did not put forward any evidence establishing that Williams—-or anyone else—-ever sent the letter to G-Shine members.

The government's evidence regarding the Reaching Back initiative failed to establish that Williams agreed that actual or threatened force, violence or fear would be used to induce Reaching Back dues payments, as is required to prove extortion under Section 1951. In particular, the only "sanction" identified in the letter was "demotion," which does not entail force, violence or fear.

That the government introduced substantial evidence that UBN members engaged in violent conduct unrelated to the Reaching

---

[4] The terms "iced out soldiers" or "iced out medallions," both of which are used in this letter, refer to incarcerated members of the gang. J.A. 288–89.

Back program does not change this analysis. Just as RICO "does not 'criminalize mere association with an enterprise,'" Mouzone, 687 F.3d at 218, so too association with a violent organization does not give rise to extortion as a RICO predicate, absent a showing that threats or violence or the organization's violent reputation was used to unlawfully obtain the allegedly extorted payments or property. See United States v. Local 1804-1, Int'l Longshoremen's Ass'n, 812 F. Supp. 1303, 1326, 1340 (S.D.N.Y. 1993), aff'd sub nom United States v. Carson, 52 F.3d 1173 (2d Cir. 1995)(finding insufficient evidence for certain alleged extortions to constitute RICO predicates due to lack of evidence of direct or indirect threats or evidence that alleged victims made payments in fear, notwithstanding that the government produced evidence that defendants were associated with mafia and engaged in other acts of extortion by virtue of fear created by that association). Here, the government introduced no evidence connecting the Reaching Back initiative to UBN's other violent conduct, let alone any evidence that UBN relied on its reputation for violence to induce Reaching Back payments. Accordingly, we conclude the government failed to put forward sufficient evidence that Williams agreed that UBN would commit the proposed RICO predicate of extortion.

Regarding the alleged predicate acts of murder, the government asserts that Williams agreed that UBN members would murder three individuals: Dread, Robbs and Star. To engage in a conspiracy to commit murder, the conspirators must have an intent to kill. See State v. Brewton, 618 S.E.2d 850, 856–58 (N.C. App. 2005) (holding that premeditation and deliberation are necessary elements of an agreement to commit murder); cf. State v. Coble, 527 S.E.2d 45, 46-48 (N.C. 2000) (holding that attempted second-degree murder is not a crime because "to commit the crime of attempted murder, one must specifically intend to commit murder").[5]

The government's evidence related to Dread amounted to a single phone call in which Williams passed along an order from Wilkinson that gang members should not "push the button on

---

[5] The indictment in this case identified murder chargeable under N.C. Gen. Stat. §§ 14-17, 14.2-4 as one of UBN's racketeering activities. See 18 U.S.C. § 1961(1)(A) (listing murder, if "chargeable under State law and punishable by imprisonment for more than one year" as a racketeering activity). Therefore, we rely on North Carolina law to define murder and conspiracy to commit murder. However, we note that even if the alleged agreements to commit murder occurred in another jurisdiction, RICO requires that the defendant agree "knowingly and willfully," Mouzone, 687 F.3d at 218, that a co-conspirator will commit an act that "if completed, would satisfy all of the elements of a substantive criminal offense." Salinas, 522 U.S. at 65. In other words, an individual who agrees that a co-conspirator will murder someone must know that the agreement's objective is to kill the victim.

Dread." J.A. 1664. The term "push the button" was never defined at trial. But even assuming that it does mean to kill someone, the evidence suggests—-at most—-that Williams ordered Jenkins <u>not</u> to kill Dread. This does not amount to substantial evidence that Williams agreed that a UBN member would murder Dread. Accordingly, the alleged conspiracy to murder Dread cannot serve as a predicate for Williams' RICO conviction.

The alleged conspiracy to murder Robbs suffers from a similar lack of evidence of intent to kill. While Robbs was in prison, Star claimed she had a copy of a North Carolina Department of Corrections ("DOC") report discussing an assault on Robbs by another inmate. The report, which Star emailed to Williams, said that Robbs "did not fight back" and made a statement to the DOC after the incident. J.A. 1687. This report hurt Robbs's reputation because it indicated that he was cooperating with investigators—-or "snitching"—-which was strictly forbidden by UBN. J.A. 463.

On June 6, 2011, Williams and Barnett spoke on the phone about Robbs's alleged snitching. Williams explained that she had spoken to Wilkinson about the report and that Wilkinson said, "if that's so, [Robbs is] Double-O." J.A. 1627. Williams clarified that "if this is proven differently"—-i.e., if the report was a fake—-"that girl [Star] . . . definitely is, is food." J.A. 1627. Williams concluded that they had to "just

33

get to the bottom of it," and Barnett agreed. J.A. 1627–28. During a June 14, 2011, phone call, Williams told Barnett that she had concluded that Star's report was fake. Accordingly, Williams explained that Wilkinson had "rescinded" the order making Robbs "double-O."[6] J.A. 1633.

None of this evidence established that Williams-or any other member of the alleged conspiracy-had the requisite intent to kill Robbs. Although Williams said that Wilkinson told her Robbs was "Double-O" if the DOC report turned out to be true, the government did not present any evidence that "Double-O" meant that someone was targeted for murder. Instead, the evidence established that "Double-O" meant a "mission." J.A. 285, 361, 432, 681–82. Although a mission might be to punish someone or make them "food," it could also mean to follow any other order, legal or illegal. With no other evidence suggesting that Williams agreed that Robbs would be killed—-and not punished, demoted, or assaulted—-no rational trier of fact could find, beyond a reasonable doubt, the requisite intent to murder Robbs.

* * * * *

---

[6] According to trial testimony, Robbs was never assaulted as a result of being labeled "Double-O" or as punishment for his conduct in relation to the prison attack.

34

The government, therefore, failed to introduce substantial evidence supporting the purported RICO predicate acts of robbery and drug trafficking, extortion, and conspiracy to murder Dread and Robbs. Accordingly, even if we were to conclude the government introduced evidence sufficient to establish that Williams agreed that UBN members would murder Star--the only remaining predicate offense asserted by the government--no reasonable trier of fact could have concluded that Williams knowingly and intentionally agreed to the commission of the two predicate acts necessary to establish pattern of racketeering activity.[7] Accordingly, we reverse Williams's conviction for conspiring to violate RICO.[8]

V.

For the reasons stated above, we find no reversible error pertaining to Barnett's convictions or sentence. However, the government failed to introduce evidence sufficient for a reasonable juror to conclude beyond a reasonable doubt that Williams agreed to the commission of at least two predicate

---

[7] Because Williams' alleged agreement to murder Star cannot, by itself, support her RICO conviction, we do not decide whether the government introduced substantial evidence that Williams agreed to that UBN members would murder Star.

[8] Because we reverse Williams's conviction, we do not decide whether the district court procedurally erred in determining her sentence.

racketeering acts forming a pattern of racketeering activity. Therefore, we vacate Williams's RICO conspiracy conviction.

AFFIRMED IN PART AND REVERSED IN PART